Filed 7/7/25  Torres v. Saied CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SANDRA TORRES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SEAN SAIED,<br><br>    Defendant and Appellant. | B336857<br><br>(Los Angeles County<br>Super. Ct. No.<br>21STCV22824) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Theresa M. Traber, Judge.  Affirmed.

Burgee & Abramoff and John G. Burgee for Defendant and Appellant.

Berokim Law and Kousha Berokim, for Plaintiff and Respondent.

\* \* \* \* \* \*

A family relative agreed to help his cousin and the cousin's common law wife pay off an overdue business loan using the couple's funds, but the transfer of funds was to occur through a series of transactions involving limited liability companies (LLCs) to avoid attracting the attention of the couple's other creditors. After the loan was purchased and resold to a third party, the relative refused to return the remaining proceeds to the couple. The wife sued the relative for breach of fiduciary duty and conversion, and the trial court ruled in her favor on both claims. The relative challenges this ruling on appeal. We conclude his challenges have no merit, and affirm.

### FACTS AND PROCEDURAL BACKGROUND

#### I. Facts[1]

Sandra Torres (plaintiff) and Farzad Khalili (Khalili) are not married civilly, but have been married "in the Jewish religion," have children together, and consider themselves husband and wife. Sean Saied (Saied) is Khalili's second cousin.

In 2017, Khalili told Saied that he and plaintiff were having financial difficulties. More specifically, Khalili explained that a commercial property he and plaintiff owned in downtown

---

[1] These facts are drawn from the settled statement corrected and approved by the trial court. Because the parties elected not to have a court reporter, the statement's recitation of facts cannot be contradicted. (*Cross v. Tustin* (1951) 37 Cal.2d 821, 826 ["[W]hen the litigant fails to convince the trial judge that his proposed [settled] statement accurately reflects the proceedings in question, the action of the judge who heard and tried the case must be regarded as final"].) We have accordingly disregarded any statements in the parties' briefs that dispute the facts set forth in the settled statement.

2

Los Angeles was in foreclosure on a $1.25 million loan and lamented that, although he had the funds to refinance that loan and avert foreclosure, he did not want to use his personal funds to do so because it might bring those funds to the attention of Khalili's other, personal creditors. Saied offered to do what he could to help without remuneration.

Khalili, plaintiff and Saied agreed to the following plan. Khalili would form two LLCs—namely, (1) Fox Plaza Hotel LLC (Fox Plaza), in plaintiff's name, and (2) Financial Group Funding LLC (Financial Group), in Saied's name. The three would avert the foreclosure through a series of transactions using the LLCs— namely, (1) Khalili "gifted" $1.25 million to plaintiff,[2] (2) Khalili transferred that money to Fox Plaza, (3) Fox Plaza transferred that money to Financial Group, and (4) Financial Group used that money to purchase the outstanding loan on the downtown property that was in foreclosure. Next, the three would arrange for plaintiff and Khalili to re-acquire plaintiff's money used to pay off the debt—namely, (1) Khalili arranged for a third party to buy the loan from Financial Group for $1,145,000, (2) the proceeds from that sale were placed into Saied's "business bank account," and (3) Saied acted as the steward of the funds in that account. This agreed-upon plan was executed in early 2017.

Over the subsequent several years, Khalili directed Saied when and how to disburse plaintiff's funds from Saied's business account, including the use of $342,313 to purchase four investment properties as part of a joint venture between Khalili

_____

[2] The record is conflicting over whether the $1.25 million came from "family savings held by [Khalili] and [plaintiff] jointly," or from a company called Model Investment Group LLC, in which Khalili but not plaintiff held an ownership interest.

3

and Saied, and to make a variety of payments to others (including $270,000 to plaintiff's sister, $44,500 to Khalili, and $50,000 to Khalili's brother).

In 2019, Khalili and plaintiff asked Saied to disburse to them $500,000 of the remaining funds in Saied's business account so they could avoid foreclosure of their home, and Saied refused. That creditor ultimately foreclosed on the house.

## II. Procedural Background

### A. *Pleadings*

In June 2021, plaintiff sued Saied for his refusal to return the balance of funds in Saied's business account. In the operative first amended complaint, plaintiff asserted claims for (1) breach of fiduciary duty, on the theory that she and Khalili "entered into an oral agreement with Saied, in which Saied acquired the duties of an agent, proxy and fiduciary on behalf of [p]laintiff," and (2) conversion. In October 2021, Saied filed a cross-complaint against plaintiff, Khalili, Khalili's brother, the joint venture, and three other LLCs for (1) common counts, (2) breach of contract, (3) breach of fiduciary duty, (4) promissory fraud, and (5) declaratory relief.

### B. *Trial and ruling*

The matter proceeded to a two-day bench trial in June 2023. At the trial, Khalili, plaintiff, and Saied testified.

In October 2023, the trial court issued a final statement of decision.

The court ruled in plaintiff's favor on both of her claims. The court ruled that Saied had breached his fiduciary duty to plaintiff. Specifically, the court found that (1) Saied had become an "agent" of the "principals" plaintiff and Khalili to "assist" them "in protecting their ownership" of the downtown property by

4

moving plaintiff's money through "several LLCs" to "avert the impending foreclosure" of that property, (2) Saied accordingly "owed" plaintiff a "fiduciary duty to act in [plaintiff's] best interest and to handle the transaction[s] with due care," and (3) Saied breached that duty by withholding some of plaintiff's funds used to effectuate those transactions. The court calculated the amount of money wrongfully withheld as $521,520.[3] The court also ruled that Saied had converted plaintiff's money, and calculated the same amount of damages. The court declined to award punitive damages (because plaintiff had not introduced evidence of Saied's net worth), and rejected all of Saied's cross-claims.[4]

The court rejected Saied's arguments that plaintiff lacked standing to sue for breach of fiduciary duty, which Saied grounded in the assertions that (1) the $1.25 million used in the transaction had originally been owned by Khalili and (2) Fox Group—rather than plaintiff—had transferred that money to Financial Group (which was the LLC in Saied's name). The court explained that "unrebutted testimony from [Khalili] and [plaintiff]" established that Khalili had given the $1.25 million to

---

[3]     The amount consists of $1,145,000 received for the sale of the loan to the third party, plus $75,000 and $8,333 in funds owned by plaintiff and that were deposited into Saeid's account, less the $342,313 disbursed to purchase properties for the joint venture and the amounts Saied disbursed from the account at Khalili's direction (that is, the $270,000 to plaintiff's sister, $44,500 to Khalili and $50,000 to Khalili's brother). Saied does not challenge this calculation on appeal.

[4]     Saied has not appealed from the trial court's ruling on his cross-claims.

plaintiff "so it was her money"[5] and further explained that the principal-agency relationship ran between plaintiff and Khalili on the one hand, and Saied on the other, such that "[t]he LLCs were not parties to the agency agreement but rather tools used to effectuate it." The court also rejected Saeid's arguments that he was entitled to keep the funds as an offset for what he was owed as part of the joint venture with Khalili, explaining that "even if Saied had a valid claim for a share of [those funds] . . . , there was no showing that" the plaintiff's money Saied refused to disburse "held any funds that could be conceived of as including Saied's share," such that "Saied [was] effectively [holding plaintiff's] remaining funds hostage to coerce a payment for his alleged share of a separate share of properties" under the joint venture. The court also rejected Saied's argument that plaintiff should be barred from recovery due to her unclean hands. Although plaintiff's and Khalili's "conduct may have been wrongful as to their creditors," the court reasoned, "this does not mean it would be inequitable to grant relief to them against Saied, who was 'fully aware' that [plaintiff and Khalali] were using the money transfer scheme to obtain maximum advantage on the [downtown property's loan] transaction without creating a target for [Khalili's] creditors."

## C. *New trial motion*

After judgment was entered, Saied moved for a new trial. Following briefing and a hearing, the trial court denied the

---

[5]     The court also noted Khalili's and plaintiff's "jointly held view that all their property and assets belong[] equally to them both," but ultimately rested its ruling on the finding that Khalili had gifted the $1.25 million to plaintiff. Thus, Saied's arguments on appeal that the trial court erred in viewing that money as quasi-community property are of no moment.

6

motion.  In response to Saied's renewed objection that plaintiff lacked standing because the funds at issue had passed through the LLCs, the court explained that its rulings "recognize[] the financial reality of a situation in which three individuals devised a plan involving the transfer of funds to Saied for a specific purpose but created and employed corporate entities to implement the deal.  This is not a question of disregarding the corporate entities but rather of recognizing them as the tools they were for the parties—vessels for accepting and transferring funds that were at the core of the parties' agency contract."

**D.    *Appeal***

Saied filed this timely appeal.

## DISCUSSION

Saied argues that the trial court erred in ruling for plaintiff on her breach of fiduciary duty and conversion claims.  Where, as here, a trial court awards the same damages on multiple claims, we may affirm the judgment as long as any of those claims supports the judgment.  (*Crogan v. Metz* (1956) 47 Cal.2d 398, 403; *Barragan v. Banco BCH* (1986) 188 Cal.App.3d 283, 304; *El Escorial Owners' Assn. v. DLC Plastering, Inc.* (2007) 154 Cal.App.4th 1337, 1352-1353.)  As discussed below, the trial court's ruling on the breach of fiduciary duty claim supports the judgment.[6]

To prevail on a claim for breach of fiduciary duty, a plaintiff must prove (1) "the existence of a fiduciary relationship," (2) "breach of fiduciary duty," and (3) "damages."  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)  A fiduciary relationship exists when a person "'knowingly undertake[s] to act

---

[6]    We accordingly have no occasion to separately evaluate the court's ruling on the conversion claim.

7

on behalf and for the benefit of another'" or "'enter[s] into a relationship which imposes that undertaking as a matter of law.'" (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 386.) A person who agrees to be the agent becomes a fiduciary to his principal. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977.) That fiduciary relationship extends to "all dealings between [the principal and agent] relating to the subject-matter of the agency" (*De Rubidoex v. Parks* (1874) 48 Cal. 215, 219; *Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 410-411), and, as to those dealings, obligates the agent to act with "the utmost good faith and fairness" and to "giv[e] priority to the best interest" of the principal at all times (*De Rubidoux*, at p. 219; *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 222, superseded by statute on other grounds, as stated in *Californians for Disability Rights v. Mervyn's LLC* (2006) 39 Cal.4th 223, 227).

Substantial evidence supports the trial court's ruling that Saied owed plaintiff a fiduciary duty and thereafter breached it. (E.g., *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) Saied offered to help plaintiff and Khalili, and subsequently agreed to their plan to shepherd plaintiff's money through a series of LLCs and back to plaintiff; this principal-agency relationship was a fiduciary relationship that imposed upon Saied a duty to act forthrightly toward plaintiff and Khalili. Saied breached that duty by refusing to give plaintiff the remainder of the money that he held for her, which was within the scope of the agency relationship. And Saied damaged plaintiff by the amount of her money he withheld.

Saied challenges the sufficiency of the evidence. He asserts that plaintiff was never a principal in any principal-agent relationship because plaintiff testified in her deposition to not knowing the details of the transactions or about the business of Fox Plaza and because plaintiff dealt with Saied only through Khalili, such that plaintiff was "not a party to the [principal-agent] transaction at all but was acting as [Khalili's] strawman." However, the trial court found that plaintiff's lack of active, personal involvement did not negate the existence of a principal-agent relationship between plaintiff and Saied because Khalili was acting "for himself *and* on behalf of [plaintiff] [in] negotiat[ing] an arrangement with Saied to effectuate [the] transaction[s] to save [the] property" (italics added), and the evidence at trial supported this finding because the funds had been gifted to plaintiff, because plaintiff was aware of "the plan" for moving her money around to pay off the loan in the aggregate, and because Khalili's specific transactions were part of that plan. (Accord, *Flores v. Evergreen at San Diego, LLC* (2007) 148 Cal.App.4th 581, 589 ["'much less evidence is required to establish a principal and agent relationship between'" spouses].) To the extent Saied asks us to re-evaluate the evidence, we may not do so while engaging in substantial evidence review. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 996.) Saied also argues that the evidence shows he is entitled to an offset for the money Khalili and/or plaintiff owed him. The trial court rejected this argument, largely on the basis of Saied's "overall lack of credibility in his testimony at trial," and we may not gainsay that credibility finding. (*In re Caden C.* (2021) 11 Cal.5th 614, 640.)

Saied raises two further challenges to the breach of fiduciary duty ruling.

First, he renews his objection that plaintiff lacks standing to sue for breach of fiduciary duty. Standing is a legal question we review de novo, although we review subsidiary factual findings for substantial evidence. (E.g., *Sirott v. Superior Court* (2022) 78 Cal.App.5th 371, 380; *Kalta v. Fleets 101, Inc.* (2019) 41 Cal.App.5th 514, 517.) To begin, Saied contends that the court may not disregard plaintiff's use of Fox Plaza and that plaintiff— as the party who used that LLC—is estopped from arguing that Fox Plaza was merely her alter ego. This contention ignores that the fiduciary relationship underlying plaintiff's claim is the principal-agent relationship between her and Khalili on the one hand, and Saied on the other. That the parties to this agency relationship agreed to transfer money through the LLCs does not improperly disregard the LLCs' independent existence in the eyes of the law or, more to the point, supplant or otherwise negate the agency relationship itself. Given that Fox Plaza has no fiduciary relationship with Saied at all, accepting Saied's argument that plaintiff lacks standing would also mean that *no entity* has standing to sue him and that he would get to keep the money that he agreed to hold on plaintiff's behalf. Saied also argues that the there is "nothing to support th[e] claim" that the funds moved through the LLCs was plaintiff's money (gifted to her by Khalili) beyond plaintiff's and Khalili's testimony, but that testimony is sufficient. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 ["'The testimony of a witness . . . may be sufficient'" to constitute substantial evidence].)

Second, Saied renews his assertion that the doctrine of unclean hands bars plaintiff from any recovery. "The doctrine of unclean hands is a defense to an equitable action" that "rests on the maxim that ""he who comes into equity must come with clean

hands."'"" (*Aguayo v. Amaro* (2013) 213 Cal.App.4th 1102, 1110.) Although "[n]ot every wrongful act constitutes unclean hands," "conduct that violates conscience, or good faith, or other equitable standards of conduct is sufficient cause to invoke the doctrine." (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 979.) To bar relief, however, "[t]he misconduct that brings the unclean hands doctrine into play" must be "connected with the controversy before the court" and "'pertain to the very subject matter involved'" such that the misconduct "'affect[s] the equitable relations between the litigants'" and thereby warrants barring the requested relief. (*Id.* at pp. 979-980; *Fibreboard Paper Prods. Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 728.) A trial court's decision not to apply the doctrine is reviewed deferentially, either for an abuse of discretion (e.g., *Farahani v. San Diego Community College Dist.* (2009) 175 Cal.App.4th 1486, 1495) or for substantial evidence (*Kendall-Jackson*, at p. 978).

The trial court here did not abuse its discretion in declining to apply the unclean hands doctrine to bar plaintiff's relief against Saied. That is because substantial evidence supports the court's finding that plaintiff and Khalili's acts in seeking to pay off the loan on the downtown property through a mechanism that did not attract the attention of their personal creditors—even if deemed, although never formally by the trial court here, to be misconduct (e.g., *Severance v. Knight Counihan Co.* (1947) 29 Cal.2d 561, 567-568 [agreement "made to defraud creditors" or to "impair[] the rights of future creditors" is wrongful])—was not connected to the duties flowing from the principal-agent relationship between plaintiff and Khalili on the one hand, and Saied on the other. The agency relationship was designed to

11

repurchase and pay off the creditor holding the outstanding loan on the downtown property; no misconduct was committed toward Saied under that plan. (*Brown v. Grimes* (2011) 192 Cal.App.4th 265, 283 ["'If [the wrongdoer] is not guilty of inequitable conduct *toward the defendant* in th[e] transaction, his hands are as clean as the court can require,'" italics added]; accord, *Martin v. Kehl* (1983) 145 Cal.App.3d 228, 239, fn. 1 [a plaintiff's conduct, "although wrongful with respect to" a third party, does "not render inequitable his obtaining relief against defendant" where the defendant "was fully aware" of the plaintiff's "device" and "was not prejudiced by" that conduct].) What is more, given the trial court's findings that Saied wrongfully retained plaintiff's money despite his promise not to do so, and the absence of a finding of misconduct by plaintiff, it would be inequitable to *deny* plaintiff relief on the basis of unclean hands.

## DISPOSITION

The judgment is affirmed. Plaintiff is entitled to her costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

12

_____, P.J.
HOFFSTADT

We concur:

_____, J.
MOOR

_____, J.
WILLIAMS*

---

* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.